Rufo *v.* The Bastian-Blessing Company,
Appellant.

Argued April 17, 1961.   Before JONES, C. J., BELL,
MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused August 7, 1961.

*Philip Price*, with him *William H. Lowery*, and *Barnes, Dechert, Price, Myers & Rhoads*, for appellant.

*Rudolph J. DiMassa*, for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, July 17, 1961:

These are appeals by Bastian-Blessing Company [Company], an Illinois corporation not registered in Pennsylvania, from an order of the Court of Common Pleas No. 1 of Philadelphia County which order dismissed the Company's preliminary objections to the jurisdiction of the court over its person and held that, under the law and the facts, the Company was amenable to suit in Pennsylvania and subject to the jurisdiction of the Pennsylvania court.

On July 12, 1960, Clementino Rufo [Rufo] and others filed a complaint in assumpsit in the Court of Common Pleas No. 1 of Philadelphia County against the Company for breach of implied warranties of fitness for intended purpose, merchantable quality and trade usage. This complaint was served upon the Company through the Secretary of the Commonwealth, purportedly in accord with the provisions of Section 1011B of

the Business Corporation Law of May 5, 1933, P.L. 364.[1]

The Company filed preliminary objections to the complaint challenging the jurisdiction of the court over its person upon the grounds that (1) it was not "doing business" in Pennsylvania, and (2) the action did not arise out of any "acts or omissions" of the Company in Pennsylvania.

The sole issue is whether the service of process upon the Company was valid under the provisions of Section 1011B which, in pertinent part, provide: "B. *Any foreign business corporation which shall have done business in this Commonwealth,* without procuring a certificate of authority to do so from the Department of State, shall be conclusively presumed to have designated the Secretary of the Commonwealth as its true and lawful attorney authorized to accept, on its behalf, service of process in any *action arising out of acts or omissions of such corporation within this Commonwealth.*" (Emphasis supplied)

Section 1011B clearly sets forth two jurisdictional requirements which must be satisfied before a non-registered foreign corporation may be validly served with process through the Secretary of the Commonwealth: (1) the corporation must have "done business" in the Commonwealth as that phrase is defined in §1011C[2] and (2) the action must arise out of "acts or omissions" of the corporation within the Commonwealth.

Section 1011C provides: "For the purposes of this Section, the entry of any corporation into this Commonwealth for the doing of a series of similar acts for the purpose of thereby realizing pecuniary benefit or

---

[1] Section 1011B was added to the Act of 1933 by §22 of the Act of September 26, 1951, P. L. 1475, as amended, 15 PS §2852-1011B.

[2] Added by Act of November 10, 1959, P. L. 1406, §1, 15 PS §2852-1011 (Pkt. Pt.).

otherwise accomplishing an object, or doing a single act in this Commonwealth for such purpose, with the intention of thereby initiating a series of such acts, shall constitute 'doing business'." Our examination and analysis of the instant record[3] indicates that the Company has done business in Pennsylvania within the intendment of Section 1011C.

The Company, a manufacturer of soda fountain and food service equipment as well as control equipment for liquified petroleum and other high pressure gases, is an Illinois corporation with its principal place of business in Chicago. It has no subsidiary, division, branch or affiliate which does business in Pennsylvania, nor does it own, lease, maintain or otherwise control any office, property or assets of any sort within the Commonwealth.

The soda fountain equipment is sold through distributors, three of whom are located in Pennsylvania. These distributors purchase the equipment from the Company for the purpose of its resale within certain assigned territory and each of these distributors has a written agreement with the Company. This agreement recites, inter alia, that: (1) the distributor is not the company's agent or employee for any purpose whatsoever; (2) that the distributor is to develop and maintain sufficient sales personnel to promote aggressively the sale of the Company's equipment, provide and maintain a representative display of the equipment, purchase and carry in stock the Company's service and repair parts, maintain contacts in order to get the Company's equipment installed in new projects, install and service all equipment purchased and resold, conform faithfully to the Company's sales plans and policy, refrain from selling items similar to equipment covered in the agreement until after all reasonable efforts to sell the Com-

---

[3] Depositions and answers to interrogatories.

pany's equipment have been exhausted, arrange all financing or deferred sales payment terms and arrange follow-up of sales to promote and maintain the goodwill of customers for the Company's equipment; (3) the distributor "shall charge its customers the prices for the respective equipment as set forth in the [Company's] published prices"; (4) the distributor is expected to secure an adequate amount of business, such amount being measured by sales quota assigned by the Company; (5) the Company retains the right to make direct sales in the territory and effect changes in the assigned territory, the equipment or discounts; (6) the agreement, not assignable, is subject to termination for violation of any of its terms. Under this type of agreement, three Pennsylvania distributors purchased from the Company for resale the Company's soda fountain and food service equipment.

While the Company had no distributors for its control equipment, i.e., for liquified petroleum and other high pressure gases, it did have two sales representatives who covered Pennsylvania. These sales representatives were employed under a so-called "RegO-Division Sales Arrangement" whereunder they agreed to devote their entire time and efforts to the promotion and sale of the Company's products in accordance with the Company's instruction and in Company-designated territory. While the agreement disclaims designation of the sales representative as an agent, the representative is paid a monthly salary plus a commission when the sales exceed an assigned quota and the sales representative is required to insure his automobile against public liability to limits Company-prescribed.

Mr. Lemon, one of the two sales representatives,[4] testified that his duties required him to "Solicit business, assist customers in the selection of equipment,

---

[4] He is titled "Sales Engineer" and lives in West Chester, Pa.

help with service problems which they may encounter" and, that, in connection with the sales to customers, he contacts all customers "as needed, convince them of the quality of our equipment and the advisability of the use of it, assist them with their service problems, if they have any, and generally try to convince them that it is to their best interest to standardize on good RegO equipment." Customers are classified as such only where they may "require equipment quite frequently, week by week, month by month, and they, having standardized on our equipment, select the equipment that they need, send the orders to Chicago for acceptance by the Chicago office". It was estimated that these customers were visited by Mr. Lemon about two to four times a year—six times at most. On these visits, Mr. Lemon might make out the order for the customer, but the general nature of the visits was described as "Good will, assistance with technical problems, public relations, if you will, keeping the Bastian-Blessing name in the foreground". Mr. Lemon also adjusted customer's complaint when authorized.

All sales of the company's products, whether soda fountain or control equipment, were made in Chicago where the Company either accepted or rejected the orders of customers who sent in orders to Chicago and all products were shipped directly from the Company's plants f.o.b. Chicago or Grand Haven, Michigan. The Company has no other financial arrangement with the purchaser than the standard thirty day net. Pennsylvania orders, accepted in Chicago, account for about three (3%) per cent of the Company's income—about $480,000 to $600,000 annually.

We find no difficulty in holding that the activities of this Company carried on and pursued in this Commonwealth through the medium of the distributors,— bound to the Company by restrictive type agreements— and, especially, the activities of the sales representatives—full time employees regularly and systematically

soliciting business and engaging in other activities for the Company—constituted "doing business" within the Commonwealth. The sales representatives certainly carried on and performed a "series of similar acts" in Pennsylvania; to hold that their purpose was not the realization of pecuniary benefit is to ignore the obvious.

The Company contends that *Swavely v. Vandegrift*,[*] 397 Pa. 281, 154 A. 2d 779, controls the present situation. In *Swavely*, the sales representatives', who were not full time salaried employees, activities were limited to making recommendations of prospective distributors, and they neither solicited business nor engaged in the other activities which are present in the case at bar. *Swavely* is clearly distinguishable from the facts in the case at bar. The instant Company entered the Commonwealth and had been "doing business" within the definition of §1011C.

However, even though this Company had been "doing business" within the meaning of §1011C, did the action asserted in this assumpsit complaint arise out of any "acts or omissions" of the Company in Pennsylvania as required by §1011B?

This Court has never construed the meaning of this portion of Section B[5]—i.e., "action arising out of acts or omissions of such corporation within this Commonwealth." The Federal Courts have considered this section on several occasions and the court below appears to have followed the construction given this Section in *Florio v. Powder Power Tool Corporation*, 248 F. 2d 367 (3rd Cir., 1957). There the plaintiff instituted a trespass action to recover for injuries sustained when a power tool, manufactured by an Oregon corporation,

---

[*] See 19 Pa. D. & C. 2d 153.

[5] In *Swavely v. Vandegrift*, supra, this Court held the corporate defendant was not "doing business" and did not, therefore, consider the second requirement.

a non-registered foreign corporation, and purchased by the plaintiff from a Pennsylvania distributor, misfired as a result of alleged negligence in its design and manufacture in Oregon. In answer to the contention of the corporation that service was invalid since the alleged negligent act occurred in Oregon and there was no act cognizable by the statute occurring in Pennsylvania, Chief Judge BIGGS, after concluding that the Pennsylvania legislature did not intend to abandon the line of authority which localizes the tort to the place where the cause of action arose, stated (p. 374): "We must conclude, in the absence of legislative history to the contrary, that it was the intent of the Pennsylvania Legislature to regard an injury flowing from the careless manufacture of an instrumentality as the *act* veritably contemplated by subsection B [citing cases and authority]. To place the narrow construction on the amendments sought by [the foreign corporation] would defeat their purpose. As we have indicated, the purpose of the amendments was to make foreign corporations suable as extensively as possible in Pennsylvania." With this interpretation and construction of the legislative intent we cannot agree.

There is no reason to cloud the present issue with conflict-of-law principles which localize the tort to the place where the cause of action arose. This conflict-of-law rule disregards the law of the place of the negligent act or omission and, instead, uses the law of the place where the injury was sustained. The Pennsylvania legislature was no more bound by this conflict-of-law rule than the Congress of the United States was when it enacted the Federal Tort Claims Act (Act of June 25, 1948, c. 646, 62 Stat. 933, as amended, 28 U.S.C., §1346(b)), and, in disregard of the conflict-of-law rule, provided that the Government should be liable in accord with the law of the place where the act or omission occurred. The language of §1011B does not demonstrate

that the legislature intended or meant the general conflict-of-law rule to apply.

The question is not where the injury occurred or where the cause of action arose; where did the Company's negligent acts or omissions take place? If the legislature mean "cause of action" or "right of action", it could and would have so stated. Indeed, if the legislature meant "cause of action" or "right of action", it would have omitted the words "out of acts or omissions of the corporation" and the provision would have read "in any action arising within the Commonwealth." The words employed by the legislature have meaning and are not to be disregarded under the guise of judicial interpretation or construction. To hold otherwise—i.e., that *"act"* means *"injury"*—is to legislate and that we cannot do.

The present statute is similar to those statutes involved in *Johns v. Bay State Abrasive Products Co.,* 89 F. Supp. 654 (D.C. Md. 1950) and *Hellriegel v. Sears Roebuck & Co.,* 157 F. Supp. 718 (N.D. Ill. 1957). In *Johns,* a defective grinding wheel, manufactured in Massachusetts, was sent into Maryland where it exploded and caused the injuries for which suit was brought against the foreign manufacturer. Jurisdiction in Maryland was based on substituted service of process authorized by a Maryland statute which provided that: " 'Every foreign corporation shall be subject to suit in this State . . . on any cause of action arising out of a contract made within this State or liability incurred for *acts done within this State.*' " The court there held that, since the only acts of the defendant occurred outside the jurisdiction of Maryland, the fact that the injury occurred there was immaterial and, under the statute, substituted service could not be made nor could the corporation be subjected to the jurisdiction of the court.

In *Hellriegel,* the plaintiff instituted suit to recover for personal injuries sustained as a result of defendant's negligence in manufacturing a power lawn mower. Service of process was made under an Illinois statute which authorized service on a non-resident corporation "as to any cause of action arising from the doing of any of said acts: . . . the commission of a tortious act within this State." The court there held that the statute did not mean the place of the injury (the place of the tort), but that it must be shown that the act or omission which created the danger and led to the injury occurred within the state. The only negligent acts of the defendant in that case occurred in Ohio and the court correctly held that it lacked jurisdiction over the corporation since no act occurred within the state of North Dakota.

There can be no doubt that the legislature, by its enactment of §§1011B and 1011C, intended to extend and enlarge the amenability to suit of a foreign corporation carrying on activities within the Commonwealth and to abolish the "solicitation plus" doctrine previously enunciated by this Court in *Shambe v. Delaware & Hudson R.R. Co.,* 288 Pa. 240, 135 A. 755; *Lutz v. Foster & Kester Co., Inc.,* 367 Pa. 125, 79 A. 2d 222. Cf: *Swavely v. Vandegrift,* supra. It, however, by no means follows that the legislature intended to make foreign corporations suable without limitation. The very language of section 1011B contra indicates such intent.

Due process does not require that the cause of action against a foreign corporation must arise out of the corporation's activities in the state where the action is brought: *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 446-447. It is clear that the Pennsylvania legislature did not choose to exercise the full extent of jurisdiction conferred upon it and did not make foreign corporations suable as extensively as it

could constitutionally have done. Through the medium of §1011B, the legislature has validated service upon a non-registered foreign corporation by service upon the Secretary of the Commonwealth only in a restricted area, i.e., where the action arose out of acts or omissions of the corporation within the Commonwealth *and* where a corporation has "done business" in Pennsylvania within the meaning of §1011C.

Under the language of §1011B, the commission of "acts" or "omissions" on the part of the foreign corporation is a jurisdictional sine qua non. Only by a distortion of the language employed by the legislature can "acts or omissions" on the part of the foreign corporation be equated with "where the injury arose" or "where the right or cause of action arose". It is a legislative, not judicial, function to extend or enlarge jurisdiction over foreign corporations and the legislature has seen fit to enlarge such jurisdiction subject, inter alia, to the limitation that the action must arise out of "acts or omissions" of such foreign corporation within Pennsylvania. Such legislatively prescribed limitation is binding upon us.

In this case, Rufo and his fellow plaintiffs allegedly were injured in Philadelphia when a "refilled portable cylinder of liquified petroleum gas commercially known as Propane", to which was attached a valve manufactured by the Company, exploded causing personal injuries and property damage. The basis of the assumpsit action is that the Company breached certain implied warranties. The record reflects that the valve was manufactured by the Company in Illinois and sold in Illinois, approximately six years prior to the accident, to a New Jersey Corporation. Sometime later by some unknown party the valve was attached to the cylinder marked as the property of the Natural Gas Company of Philadelphia. In March, 1956—four to five years after the sale of the valve by the Company—

Rufo obtained the cylinder and attached valve from a J. F. Martin in Philadelphia. With Martin the Company has had no contact and to him has sold none of its products. If this valve was defective, by reason of negligence in its manufacture or of failure to inspect, it is clear that the only "acts" or "omissions" to act relating to this valve on the part of the Company must have taken place in Illinois, not in Pennsylvania. Under the law and the facts, in the absence of any "acts" or "omissions" on the part of the Company in Pennsylvania, the Company could not be validly served under §1011B. The objection of the Company to the jurisdiction of the court over its person should have been sustained.

Order reversed. Costs on appellees.